UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
BUILDING SERVICE 32BJ HEALTH FUND, :
BUILDING SERVICES 32BJ LEGAL SERVICES :
FUND, BUILDING SERVICES 32BJ THOMAS : 08-CV-00898 (RWS)(JCF)
SHORTMAN TRAINING, SCHOLARSHIP AND :
SAFETY FUND, :
 :
                Plaintiffs, :
  -against- :
 :
SHAMROCK ACQUISITIONS, CORP. d/b/a :
SHAMROCK BUILDING SERVICES AND :
SHAMROCK BUILDING SERVICES :
CORPORATION d/b/a SHAMROCK BUILDING :
SERVICES, :
 :
                Defendants. :
------------------------------------------------------------ x

## AFFIDAVIT IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

STATE OF CONNECTICUT)
                     ) ss:
COUNTY OF FAIRFIELD )

**CARL SHANAHAN**, being duly sworn, deposes and says:

1.     I am the president and largest shareholder of defendant Shamrock Acquisitions, Corp. ("Shamrock") and respectfully submit this affidavit in opposition to plaintiffs' Motion for a Preliminary Injunction.[1] Shamrock, which has been in business for over 40 years and, we hope, will continue for another 40, has fallen significantly behind in its contributions to the plaintiff Funds. We fully recognize our obligations to make these payments.

---

[1] The other defendant, Shamrock Building Services Corporation, no longer exists.

NEWY1-636033-2
04/29/08 11:27 AM

2. As discussed briefly below, and which we offer as an explanation but not an excuse, Shamrock had a difficult year in 2006 after purchasing a New Jersey company in 2005. The problems with that company caused significant cash flow problems which are, fortunately, coming to a close.

3. After this lawsuit was commenced and motion filed, Shamrock has remained current in all its welfare fund contributions for the period January 1, 2008 to the present. Further, Shamrock has recently completed a full accounting of arrears which are due, which accounting has been sent to plaintiffs' attorney and reflects that Shamrock owes $595,069 for past contributions (Exhibit A), with respect to which Shamrock is prepared to enter into a payout schedule with plaintiffs, as discussed in more detail below.

**Nature of Shamrock's business.**

4. I started Shamrock in 1969 in Connecticut. Shamrock was and remains in the business of providing janitorial services to commercial buildings, which includes the usual office cleaning, trash disposal, window cleaning and the like.

5. Since 1969, Shamrock has extended its geographic scope to various states in the eastern seaboard and, as discussed below, expanded into New Jersey in mid-2005 with the acquisition of a company called Dekar Industries, Inc.

6. Shamrock has approximately 945 employees nationwide, with approximately 164 in Connecticut and 117 in New Jersey.

7. Shamrock has always been a family business. I own the largest percentage of stock in the company with the balance distributed equally among my six sons.

8. In addition, two of my sons are employed full time in the business, which is the sole source of their livelihoods.

2

9. My son, Carl Shanahan, Jr., is based in Florida and is essentially the Chief Operating Officer of Shamrock. My other son, Kevin, runs the day-to-day operations in Connecticut.

10. We have always had excellent relations with the unions that represent our employees in Connecticut, New Jersey, Pennsylvania and Massachusetts. Our employees in Connecticut were organized approximately 10 years ago, in 1998, and we have always been – and remain – current with our Connecticut Welfare Fund contributions. Until we recently encountered our problems in New Jersey, we had also always been current in our payments to the New Jersey Funds.

**Recent difficulties in New Jersey.**

11. In June 2005, Shamrock Acquisitions, Corp. decided to enter the New Jersey market and purchased Dekar. At the time of the purchase we recognized that Dekar was in arrears with respect to its contributions to the Funds, but we went ahead with the purchase anyway, fully intending to clean up this problem and forge a profitable organization in New Jersey.

12. Significant setbacks followed, including the loss of a major New Jersey customer representing a substantial share of our New Jersey revenues, and in 2006 Shamrock recorded a significant net loss for the year and fully utilized its available lines of credit.[2]

13. After our substantial loss in 2006, we were able to financially recover, and in 2007 we had a relatively small net operating loss, but have become increasingly profitable this year.[3] However, although our 2006 and 2007 financial statements reflect Shamrock's

---

[2] While we could have set up a separate subsidiary to do the New Jersey business – and insulated Shamrock from the New Jersey problem – we chose not to do so.

[3] Attached as Exhibit B are unaudited internal financial statements reflecting a net profit of $8,277 in January, $77,055 in February and $84,050 in March, all after making full Welfare Fund payments.

3

obligations to all of the Funds, we had been unable, due to cash flow problems and a lack of available credit facilities, to pay all of these obligations.

14. We have never ignored our obligations to the Funds; to the contrary we have always believed that the Funds are another and important type of compensation to which our employees are entitled and have made every effort to meet our obligations. The health benefits provided by the Funds are crucial to the welfare of our employees and their families. In fact, despite Shamrock's last two difficult years, Shamrock has made Fund contributions when it was able to.

**The issue of Shamrock's delinquency was first raised by the Funds when this litigation was commenced.**

15. We have never attempted to avoid our ultimate financial obligation to the Funds, and in fact have continued to book amounts due to them on Shamrock's financial statements fully expecting to be able to repay all of the arrears.

16. In fact, during the time that Shamrock did not pay any contributions, we never received any inquiries from the Funds, complaints or otherwise.

17. Specifically, we never received word from any of the Funds that they would terminate health, legal or other benefits to any of our employees because the contributions were not paid and, as far as I know, all of our employees have always received those benefits, and I trust will continue to receive them.

**Shamrock has turned the corner financially, is current in its contributions on a going forward basis and will pay its arrears.**

18. Once we improved Shamrock's financial situation, we approached various banks with a view towards restructuring Shamrock's finances (i.e., consolidating existing loans into new financing with more attractive interest rates and payment schedules).

19. Even before this action was commenced, Shamrock was in discussions with two banks namely, M&T Bank (located in White Plains and based in Buffalo, New York) and Norfolk Bank, to arrange refinancing for Shamrock which would create additional cash flow and also enable Shamrock to pay the welfare fund contributions which are owed.

20. I had originally hoped, and we advised plaintiffs during a settlement conference held on February 11, 2008 (described in more detail below), that we had been expecting to complete these negotiations and obtain the refinancing by the end of March. Unfortunately, we have been unable to meet the schedule due, in part, due to the difficult economic climate, and we are nonetheless persisting in our efforts to obtain such refinancing.

21. We have also advised plaintiffs that we are prepared to agree to a settlement for the arrears, even without refinancing in place, and requested another brief adjournment of this motion to finalize the settlement. Plaintiffs refused to agree, and the motion remains returnable on Wednesday, April 30.

22. If the Court issues a preliminary injunction we would no longer be able to restructure the company and renew our credit line. The banks with whom we are now negotiating would terminate these discussions since any injunction would strip Shamrock of any cash it has left and put the continued viability of the company at serious risk.

23. The plaintiffs probably do not realize that by seeking the ultimate relief – a preliminary injunction – they would irreparably hurt their own beneficiaries if they succeeded. Bluntly put, if plaintiffs prevail, they will likely put Shamrock out of business – or at the least force us to slash expenses and layoff many of our employees in order to survive.

24. The alternative we are proposing is best for everyone: Shamrock is now current going forward and is ready to commit to a payout of the arrears.

**Shamrock is currently in good faith seek a full resolution of its obligations to the funds.**

25.  I first received notice of this lawsuit from the Funds' attorney on Saturday, January 26, 2008. I did not duck that or subsequent calls, avoid my obligations or attempt to make any excuses.

26.  In fact, the first thing I did was sign the Waiver of Service of Summons and then seek counsel to represent me.

27.  The order to show cause bringing on plaintiffs' motion for a preliminary injunction was signed on February 6, returnable February 12. Almost immediately we held a settlement conference among representatives of plaintiffs, and the parties' counsel on February 11 during which Shamrock: (i) delivered its check in the amount of $38,657.88 to plaintiff representing contributions for the month of January 2008 and agreed to remain current on a going forward basis with respect to all contributions; (ii) agreed to provide to plaintiffs Shamrock's calculations of all amounts owed prior to January 1, 2008.

28.  The parties' also agreed to adjourn the preliminary injunction motion, and said motion was adjourned first to April 2 and again to April 30, with the Court's consent.

29.  With respect to the arrears, we intend to work out a fair payment schedule with the Funds, which could of course be accelerated when Shamrock obtains it refinancing which will create additional cash flow.[4]

---

[4]  I do not think it is appropriate or productive to spend significant time addressing the Funds' calculations as to amounts due. I would note, however, that the total amount of contributions they claim due, $1,356,904.94 ($1,227,264.94 (NJ) plus $129,640.00 (CT)) is significantly more than we have estimated. In addition, without any backup, it is impossible for us to calculate the Funds' interest figures. Finally, the liquidated damages claimed by the Funds (particularly for New Jersey, see their Exhibit C) appears to be grossly inflated totaling between 31% to 48% of the principal due, which far exceeds the 20% statutory amount or the actual interest claimed by the Funds. Suffice it to say, the parties have bit of work to do to come up with accurate figures and agree on the amounts due.

30. In any event, Shamrock, after a rocky period following the purchase of Dekar, has clearly turned the corner, and my sons and I intend to continue to focus on the growth and financial health of the company. Shamrock has been in business for almost 40 years. The company has supported me and my family and now supports two of my sons and their families. In addition, my other four sons each have a significant financial interest in the continued prosperity of Shamrock.

**Current status of settlement negotiations among the parties.**

31. As of early last week, Shamrock had still not secured its financing, but we nonetheless agreed to enter into a final settlement agreement with the welfare funds under which Shamrock would pay all arrears, plus appropriate interest and liquidated damages, over a two year period.

32. Counsel has received a draft of the agreement, and we have orally advised plaintiff's that Shamrock will agree to all material terms, including a confession of judgment and the various protections insisted on upon by the Funds to insure payment.

33. Further, on April 28 we completed our analysis of arrears which are due, and our counsel forwarded our summary spreadsheets to plaintiffs' counsel reflecting that a total of $595,069 (not including interest and liquidated damages) is owed to the Funds for the period prior to January 1, 2008 (Exhibit A).[5]

**Preliminary injunction relief is not necessary.**

34. We respectfully suggest to the Court that injunctive relief is not necessary or appropriate at this time.

---

[5] Shamrock's total obligation was $917,371, of which $322,201 had been paid in the normal course, leaving a balance of $595,069.

35. Once we learned of this lawsuit, Shamrock did not bury its head in the sand. To the contrary, we stepped up to the plate and are now directly facing our obligations and will shortly be opening up a dialogue with the Funds.

36. As a viable business, Shamrock can pay the arrears over time. If an injunction is entered, Shamrock's credit will be ruined, it will lose its ability to refinance, and full payment of the arrears would be unlikely.

37. No injunction is necessary because the Funds will not be irreparably injured. The Funds have not made any claim that the amounts owed by Shamrock have put their finances at risk, and I would suspect that Shamrock's employees represent but a fraction of a percent of the Funds' membership.

38. Further, no injunction is necessary because the Funds' members, i.e., Shamrock's employees, will not lose any benefits. As noted above, during the period that Shamrock was remiss in making its contributions, we were never warned that benefits would be cut off to our employees, and no employee ever advised us that their benefits had in fact been terminated. We are paying contributions on a current basis, and certainly under the circumstances (including our immediate intention to work out the arrears) the Funds can hardly suggest that any members benefits will *now* be terminated.

39. Finally, no injunction is needed to compel us to produce the relevant records because we unreservedly recognize that obligation and have delivered them to the Fund's attorneys.

## CONCLUSION

Based on the foregoing, it is respectfully submitted that plaintiffs' motion for a preliminary injunction should be denied.

_____
CARL SHANAHAN

Subscribed and sworn to this
29 day of April, 2008

_____
Notary Public

JUAN M. AMARILLO
NOTARY PUBLIC
MY COMMISSION EXPIRES MARCH 31, 2012

# EXHIBIT A

Hard copy of exhibit being filed with the permission of Mr. Chan from Judge Sweet's chambers.

# EXHIBIT B

Hard copy of exhibit being filed with the permission of Mr. Chan from Judge Sweet's chambers.